Good morning. May it please the Court, my name is John Kline and I represent the petitioner appellant, Mr. Rana. And I'd like to reserve five minutes, please. We'll try to help you, but keep your eye on the clock. I will. The central question here is whether the known abyss-in-idem provision in the U.S.-India extradition treaty, the double jeopardy provision I'll call it, just because it's easier to say, permits extradition of a man who was acquitted by an American jury for prosecution in a foreign country on that same conduct. That's the question here. The answer to that question is no, and the answer is no for four reasons. Doesn't your statement of the issue assume the answer when you describe the issue as whether he was prosecuted for the same conduct? But there's certainly an argument, given the language of the treaty, that it's for the same offense and that we should do an elements comparison. I framed it the way I did because I don't think there's any dispute that India seeks to prosecute Mr. Rana for the same conduct on which he was acquitted in this country. But perhaps a different charge, right? If the offenses, if the offense that they, the charges they bring against him are different than the charges here, it doesn't, isn't that acceptable under the treaty? I certainly agree with Your Honor that the answer to my question is, turns on the meaning of the word offense in Article 6.1. There's no question about that. And my argument is that the word offense in Article 6.1 refers to conduct rather than elements. And that's the point on which I will offer my four grounds. And I gather you have four different reasons why you think that is the case. Can we start with the case law? As you know, you've got a Fourth Circuit case, an Eleventh Circuit case, which, say, it's, actually deals with elements, not conduct. You've got Sendona, which relied on Justice Brennan's concurrence, and Ashe, which was basically eroded in Dixon. So what's your best argument, given the case law from the Second, I'm sorry, the Fourth and Eleventh Circuit, seem to suggest that your position is not meritorious? What's your argument that that is incorrect? Well, let me start with that Fourth Circuit case. Okay. Because I, Gahn versus Holt, because I think it actually, I think it actually supports my position. The reasoning in Gahn versus Holt turned on the difference between the dual criminality provision in that treaty, it was the U.S.-Mexico treaty, and the double jeopardy provision, the known bis provision. In that treaty, the dual criminality provision referred to acts, and the double jeopardy provision referred to offense. And the court, the Fourth Circuit, highlighted that difference in language in determining that offense in the double jeopardy provision must refer to something other than acts. And the most logical explanation was, it refers to elements. The government highlighted that point in its brief. The Fourth Circuit relied on that point. Here we have the converse. The dual criminality provision refers to offense. So does the double jeopardy provision, Article VI. And you're talking about double jeopardy, you're talking about the Latin language for that, from your perspective, right? I am, and I'm to avoid tripping over the language, I'm going to call it double jeopardy, but it's known bis in idem. But the dual criminality provision in the U.S.-India treaty uses the word offense. So does the double jeopardy provision, Article VI.1. If the difference in language was critical in Gahn in determining that offense in the double jeopardy provision meant elements, the sameness of that language here should produce the opposite conclusion. But what about the different use of language within Article VI itself? So VI.1 says offense and VI.B says acts. I mean, that's within the same article of the treaty, and you're looking to the dual criminality article, which is Article II, which has prefatory languages for purposes of this article. And Article VI.2 addresses a situation where the word offense doesn't fit particularly well. Article VI.2 addresses a circumstance where the requested state here, the United States, either has not prosecuted at all, so there's been no charge, nothing that could be called an offense, or there was a charge and then was dropped. In that circumstance, the treaty uses the term acts. I don't believe that the term acts in VI.2 was meant to contrast with offense in VI.1. I think, in fact, the two terms mean essentially the same thing, just in different contexts. And as evidence of that, if you look, and we cite this in our reply brief, if you look at the Belize and Bolivia treaties, which were negotiated by the same State Department during roughly the same period, when I say the same State Department, I mean during the administration of President Clinton, the transmittal letters for those two treaties explain the meaning of the analog to Article VI.2, and they use the word offense. I think in Article VI.2, the word acts is suitable to the context, but I don't think it means anything other than offense, and I certainly don't think it was meant to contrast. With respect, I thought the State Department's technical analysis on this particular treaty that was sent to the Congress in connection with the India Treaty supports the government's interpretation that it really is elements that they're talking about. What's your response to that? You're right, Your Honor. That is what the technical analysis that accompanied the India Treaty is. And I analogize that circumstance to, for example, Chevron and other deference standards, our deference, Chevron deference, because the treaty-related case that's probably most on point for our position is Hill v. Norton from the D.C. Circuit, where, again, an executive branch agency, I forget which one, the Department of Interior, I think, offered an interpretation of a treaty but gave no reasoning whatsoever, and the D.C. Circuit declined to defer to that interpretation. I think the same thing goes here. If there were some reasoning, if the technical analysis, and I'm tempted to put that in air quotes because there's really no analysis at all, if the technical analysis had offered some reasoning for the conclusion that it reaches, then perhaps deference would be appropriate. But it doesn't. It's simply an assertion by the executive branch. So do you take the position that Chevron actually applies in this case? Chevron, by its terms, does not apply. Chevron is a... Neither does our, right? Neither does. But courts have, including Hill v. Norton and a couple of other cases that we cite, courts have analogized the deference to an executive branch interpretation of a treaty to Chevron deference. Hill does that. There's a Fifth Circuit case that we cite. There's a D.C. District Court case that does it. And I think that's appropriate because determining the meaning of the treaty is, of course, a judicial function. Right. And if my colleagues have no objection, could I get you just to succinctly say what your four points are and get that on the record because I'd like to know whether that obviates any of my four. Perhaps you could address Duarte-Acero, which is the Eleventh Circuit case. I believe Judge Smith was interested in that as well. Yes. So my four points to get those out there. Number one is the use of the word offense in Article 2.1, which is the dual criminality provision and the canon of interpretation that the same word and the same enactment or treaty is presumed to have the same meaning. It's not an inflexible presumption, but it is at least a presumption. The second ground, which Your Honor has already raised, is the Gahn versus Holt case from the Fourth Circuit. The reliance on the difference between acts and offense in the dual criminality versus double jeopardy provision in that case seems to me to clearly imply that if the same language is used, the same meaning should be afforded. So that's the second ground I was going to raise. The third ground, and I'm going to sort of shorthand this because I argue it at length in the brief. Blockberger is fine for a single sovereign double jeopardy regime because the legislative branch that is drafting the code, enacting the code, can take Blockberger into account and can make offenses either overlap or not overlap and therefore be subject to multiple punishments or not. In a separate sovereign regime, whether it's federal, state, or here even more so, two different countries, it makes no sense at all. It is pure coincidence whether the elements of an Indian offense and a U.S. offense overlap or don't overlap. Why don't you go to point four? I'm trying to keep you from one of us. Thank you. My fourth point is the Headley plea agreement, which I think quite clearly takes the position... You covered that extensively in your brief. I did. So I understand and wouldn't you mind going to Duarte, which Judge Smith was asking about. Duarte interprets a different treaty, not an extradition treaty. It talks about prosecution within the same country, not between two different countries, and most significantly to me in that case, the Colombian government had declined to extradite the petitioner or defendant or whatever he was in that case, taking the view that the double jeopardy provision applied to conduct rather than elements. So I don't think, bottom line is, I don't think Duarte has anything to do with this case at all. It's not an extradition case. It construes a different kind of a treaty and in the extradition context in that case, the Colombian government... Duarte did deal with non-bis and dindum. I don't think so. It did not. I believe it dealt with a different treaty and... But it used the language non-bis and dindum, didn't it? Item or however you say it. I don't know if it did or not. I know ultimately it was construing not an extradition treaty, but a different treaty that involved prosecution within the same country. Do you think that the distinction between an extradition treaty and a different type of treaty is, if you will, important here, determinative? What's your feeling? I do. I don't think that 11th Circuit case has any application here. Because it's a different kind of treaty. It's a different kind of treaty and in the extradition context, as I'm recalling the facts of that case, the Colombian government, based on a conduct analysis, had declined to That's sort of the shorthand. I'll take another look at my brief and I may have more to say in rebuttal. What do you do with Abbott that we are to give substantial weight to the State Department's interpretation? I think as a general interpretive principle, that is, of course, the law. The But I also think that, as with any standard suggesting deference by the judicial branch to an executive interpretation, a lot depends on the analysis itself. A reasonable analysis, a thoughtful analysis, an analysis that actually analyzes, I think would be due considerable deference. An analysis that is really just an ipsy-dixit, to use another Latin phrase, I don't think is entitled to deference at all. I'll also say this. I think both the notion of deference and the notion of interpreting a treaty in favor of extradition, which is another sort of a principle that the government invokes, I think those are a bit like the rule of linity in the They come in, if they come in at all, they come in at the end of the process, after you've looked at the text of the treaty and done a textual analysis. What role, if any, should the fact that the government of India construes the treaty in the same way that our government does? Well, the construction we have from the government of India is one written by the prosecutor in the case. Of course he's going to take the position that the treaty permits the extradition of Mr. Rana. So we just view that simply as a document of advocacy, not one of reasoned position for interpreting the treaty? I think that's exactly what it is. It is a piece of advocacy. So why do the technical notes need to contain substantial or even just some analysis of the State Department's position? Because aren't the the treaty to mean? It is. Right, so they're not going to do a big analysis. They're sending notes to Congress saying this is what we think the treaty means. This is it. Here's our understanding. It doesn't seem that you were suggesting earlier that we really shouldn't give any weight to those technical notes or analysis and you denigrated them and saying, oh, they're not even really analysis. They're just too succinct, too terse to provide any weight to what the treaty means. Two responses to that, Your Honor. One is I think sometimes technical analyses actually do analyze a bit. This one does not. But does that matter? Is there a case law that says that they have to say a certain amount? Well, it matters to this extent. The State Department is saying what its position is on this treaty. Perhaps that's entitled to some deference even without any analysis. I'll tell you what undercuts that, though, is Mr. Hedley's case. The problem is the government seems to be willing to take the position that this treaty means whatever it needs it to mean. Because in Mr. Hedley's case, the U.S. attorney for the Northern District of Illinois, a highly respected lawyer who I've tried cases against, got up and said the treaty, under the treaty, Mr. Hedley is protected for conduct. And I am. But I thought in Hedley's case, though, that part of his plea was specifically that he would not be extradited. Doesn't that undercut your argument there? I mean, what difference does it make what the U.S. attorney said in that case? Because what the U.S. attorney said was that it was the treaty that called for that conclusion. If this had simply been a negotiated plea agreement with no reference to the treaty and protections that clearly extended beyond the treaty, that might be one thing. Although even then, there'd have to be some discussion with the criminal division under the Justice Manual. But here, both the plea agreement itself and Mr. Fitzgerald's explanation of the treaty at the plea colloquy referred specifically to the treaty. Okay. You want to say, you've taken it well past where you wanted to go. Do you want to save the balance of your time for rebuttal? I'll save my remaining two minutes and 52 seconds. Very well. Thank you. Thank you. All right. So we're now going to hear from Mr. Alden, correct? Correct. Good morning. Good morning, Your Honors. May it please the Court, I'm Alden for the United States. I'm joined at council table by AUSA John LeLegend, who handled this matter in the lower courts. The lower courts here got it right. Rana is extraditable to India under the plain provisions of the treaty, and India has established probable cause to prosecute him for his role in terrorist attacks that resulted in 166 deaths and 239 murders. So let's say we probably agree with your position. What do we do with Clary versus Greg, Ninth Circuit President? How do we rule in your favor without violating that precedent? Clary v. Greg is entirely about dual criminality, and there's no real dispute here on dual criminality, which is to say both the United States and India make this specific conduct criminal. In the dual criminality context, this Court has held, as has the Supreme Court, that the analysis should look to the conduct underlying the offense. Otherwise, virtually nothing would be extraditable, and it would contravene the intent of the parties. And ultimately, that is the purpose of treaty interpretation, and something that I think Rana is really losing sight of, which is that this Court's only role, and that is what the Shoji and an Abbott, is to interpret the intent of the parties. Here, the parties agree on the meaning of this treaty provision, the non-bis provision in Article 6.1. Both parties have now stated what they intended, that that provision be interpreted based on the elements of the offense and not based on the conduct underlying those crimes. That is consistent with long-standing Supreme Court double jeopardy precedent. Obviously, in both the Gamble case and the Dinesby case, where there were separate sovereigns, the Supreme Court has said there is no double jeopardy limitation, and when we construe the word offense, it is construed to mean crime. In the double jeopardy context, which is what the parties were interpreting and incorporating into their treaty provision in Article 6.1, there is no limitation whatsoever on successive prosecutions by separate sovereigns. So, absent this treaty, there would be no limitation double jeopardy-wise at all. So, when you look at this treaty and are interpreting what the parties intended, it was a very narrow exception to the rule that there would otherwise be no limitation at all. Let me ask you this, counsel. Taking the government's position that it's really elements that we're looking at, elements of a crime, let's say that the elements of the crime for which Mr. Rana was prosecuted but not convicted were exactly the same as the elements of the crimes charged in India, would that be a situation where there would, in effect, be double jeopardy and he would not be extradited? There wouldn't be a double jeopardy bar under the Constitution, but yes. There would not under the Constitution, but there would under the treaty. Okay, so basically, if we look at this as the government argues and arguably the case law says, we look at elements, you don't have that situation here. You have different elements under Indian law for which he's being charged, so you don't have double jeopardy, but the government concedes that if they were the same elements of the same crimes, then in fact, he would not be extradited. That's exactly right, Your Honor, and that is what the parties intended, and Rana has never even attempted to make an argument that he could satisfy that standard. He concedes effectively that that standard cannot be met, that he cannot show that the same elements for which India seeks to prosecute him were the same elements that he was prosecuted for in Chicago. To go back to some of the other points that Your Honors were making, Judge Smith, I do agree that the Fourth Circuit and the Eleventh Circuit have both rendered decisions that are relevant here. Duarte Acero, the Eleventh Circuit decision, didn't specifically use the words non bis in idem, but it did use the words double jeopardy in analyzing the provision of the convention that was at issue in that case. Effectively, it's like not the same thing twice, and in the Duarte Acero case, the Eleventh Circuit looked at the provision of a convention that limited successive prosecutions based on the same offense and said that triggers an elements-based analysis for double jeopardy purposes. That is exactly the argument that the Fourth Circuit adopted in Yigon. Counsel points to the fact that Yigon based its analysis somewhat on the distinction between the word acts in the dual criminality clause that Clarity v. Gregg was talking about versus the word offense in the non bis provision, but that was not at all the basis of the Fourth Circuit drew this distinction, which was at page 1286 of their opinion, and they are pointing out that, sorry, that's the Duarte Acero opinion, it's 1286, where it actually makes the point that I just made, and then in the Fourth Circuit's opinion in Yigon, they specifically say that the most natural reading of offense as distinct from acts is that offense refers to the definition of the crime itself, with no pointing to which specific provision it was in as the basis for the analysis. What the Fourth Circuit held was that because there were two words at some point in the treaty that were different, the court had to interpret them differently, and I think Judge Beatty's point is really pertinent here, which is that here, the two words that are different appear in adjoining provisions of the same article of the treaty, which would make this an even stronger case under cases like McMaster, which have said that when you have two different words in the same exact article or adjoining provisions, that that should be an even stronger basis to say there must be different meanings to those two words. The opposing counsel, and for that matter, some of their other cases deal with Sindona v. Grant, which of course was a 1982 Second Circuit case. That seemed to have relied on a concurrence by Justice Brennan in Ashe v. Swenson, but was arguably eroded in Dixon, and then they cited the internal D.O.J. Petit policy. What's your comment about that case, since that one does seem to take an interpretation different than either Duarte, Acero, or Egan? Correct, Your Honor, and the three foundations of Sindona have been eroded. In fact, Elcock, which was a case that came out of a district court in the Second Circuit after Sindona, didn't even apply Sindona after its three foundations had been eroded. And I agree with Your Honor completely that the first foundation was Justice Brennan's concurrence in Ashe, which was then really repudiated by the Supreme Court's decision in Dixon. The second foundation was this idea that foreign nations might not be familiar with the American double jeopardy jurisprudence and the way that Blockburger analyzes elements. That's not true here. We know, based on India's own analysis and their own common law that originates from Britain, just like ours, that they too use an elements-based double jeopardy jurisprudence. And the third foundation, the government's Petit policy, that actually cuts in favor of the United States, it shows that the United States knows exactly how to limit itself when double jeopardy constitutionally does not. If the United States had wanted to impose that same limitation here, it could have negotiated that with India, and it didn't do so. A few other points that opposing counsel raised that I did want to address. I think, Judge Smith, you pointed out that Chevron deference is not something that is absolutely imperative to realize that this is about interpreting two parties like a contract. This is a contract and what they intended. Both parties agree. This is not about interpreting an agency regulation that is intended solely to regulate the public or solely to interpret a statute. This is about interpreting a statute that makes perfect sense to afford substantial weight, as the Supreme Court has said in Abbott, as it said in Sumitomo Shoji, as this Court has reiterated in other case law, to the views of the parties, because ultimately, again, the only role of the Court is to interpret the language of the treaty in a way that advances and really implements those parties' views. So your opposing counsel suggested, or I understood his remarks, to suggest that the views of the parties perhaps are not entitled to deference or much weight because they're changing, depending on the circumstances. So in India, the prosecutor who wants to have Mr. Rana extradited and prosecuted is saying, well, this is what the treaty means, and so we should look at that with a grain of salt. And here, the United States has taken a, you know, based on their interpretation of the remarks at the Headley plea colloquy, has taken a different position. So if the two states who are involved are taking differing interpretations based on expediency, why do we give that much weight? The United States has not taken different positions, because the United States' only formal position that it has ever articulated in advance of ratification of this treaty, in a report to the Senate that had to ratify the treaty, that was formalized and adopted in the Senate record, was the technical analysis position. This court, nor the Supreme Court, has never deferred to an off-the-cuff statement that a U.S. attorney has made during the course of a plea colloquy, nor has it deferred to something that was written in a single defendant's plea agreement. What it has deferred to and what the Supreme Court has deferred to is the formal, official analysis that was in the technical analysis and the opposing counsel agrees, clearly supports the government's position here. So I do not believe that the United States has taken differing positions. As to India, I admit that this position was adopted in connection with this case, but nothing precludes this court from giving deference to that either. In fact, in Sumitomo Shoji, what was given deference to was an amicus brief that the government had filed in that case. And the same thing happened in Abbott, where it was an amicus brief that the United States had filed in that specific case, articulating its position. The Supreme Court gave deference to both of those briefs over the objection of the dissent who said, we should not be deferring to something that was developed for purposes of litigation. I gather there is also nothing in the record that shows that the government of India has taken an opposite and contrary position to the one that's taken in this case. That's absolutely correct, Your Honor. And the position it took in this case was developed by the special public prosecutor. He formalized it, and it was sent to the United States in a diplomatic note. That is the official position of India, just as the technical analysis is the official position of the United States. I gather, since the Constitution requires the Senate to ratify a treaty, that the State Department explanations of what was intended has got to be given a fair amount of deference, because it is the explanation of the government of what it intended, for purposes that the Senators can consider it in determining whether to ratify the treaty, right? That's absolutely right. Absolutely right. And it goes back to the same point I've been making, which is what the Supreme Court said in Summa Toma Shoji. Our role is limited to giving effect to the intent of the treaty parties. When the parties to a treaty both agree as to the meaning of a provision, we must defer absent extraordinarily strong contrary evidence. And it is exactly for that reason, which is that we are interpreting the intent of the parties. This is a formal position that is given to the Senate that has the role to play constitutionally in ratifying this treaty. And I gather just in passing, as you know, your opposing counsel has argued that there's not competent evidence supporting probable cause. They have an extremely difficult burden to meet. But I gather that it's the government's position that they don't come close to meeting that, that basically this is like probable cause in connection with a criminal indictment. The fact that the person providing evidence that underlies the probable causes credibility is attacked doesn't matter. Is that correct? I would go even further to say in a criminal case, when you have a magistrate actually evaluating probable cause for criminal purposes and a prosecution that's going to happen here, it is actually more defense friendly than in a case when you're merely determining, excuse me, whether the magistrate can extradite. And at this stage in particular, when the habeas case and the habeas court was merely evaluating whether there was any competent evidence that could have supported the magistrate judges finding a probable cause. Excuse me. So the law, as your honor is suggesting, is extraordinarily favorable to the government on habeas review, where Rana must, quote, completely obliterate probable cause. That is what the case law holds. There is no way he has met that, which is probably why the reply brief effectively gave up on that argument. The evidence is overwhelming to support probable cause, that low standard. That Rana knew about what was going to happen in India between 2006 and 2008. He met with Headley multiple times. There is documentary evidence that supports Headley's testimony, including the fake visa applications that were provided so that Headley could operate a fraudulent business in India in order to conduct surveillance, in order to carry out those terrorist attacks. There was a phone call, of course, after the fact, where Rana said that he was informed about what was going on by one of their co-conspirators in Pakistan, and his praise for what was carried out in a gruesome terrorist attack that killed 166 people, injured 239 more, and cost India $1.5 billion. It was primarily at the Taj Mahal Hotel, right? Primarily at the Taj Mahal Palace Hotel, but the terrorists attacked a number of bars, restaurants, the Chabad House. There were other targets in India that they were attacking in Mumbai, and it was their 9-11. It was a devastating attack over the course of multiple days that resulted, as I have said, in 166 deaths, including six Americans. That is why India wants to prosecute this case and, under the extradition treaty, has every right to do so. Opposing counsel maintains that it is important that his client was acquitted of certain charges in the Northern District of Illinois trial. I take it your position is the fact that someone wasn't proved guilty beyond a reasonable doubt doesn't mean there was not probable cause. Absolutely, Your Honor, and to the extent he wants to raise humanitarian concerns or even concerns about the process, the acquittal, the fact that he is facing extradition, those all get raised and can be raised to the Secretary of State. That is the person who is empowered to evaluate and balance concerns about potential acquittal, double jeopardy that isn't precluded under the language of the treaty, humanitarian issues, circumstances in India. Take all of those things into consideration and determine whether or not to extradite. And that's the next step. If, arguendo, if we affirm the district court, then Mr. Rana can appeal to the Secretary of State, make a final appeal before he would actually be extradited. Yes, and my understanding is he has already actually made an appeal, and he can pursue that appeal with the executive branch that has the authority and discretion to determine whether to ultimately extradite. So the Secretary of State basically has carte blanche to decide what he or she is going to consider in making that determination. Is that right? I share that understanding. Thank you. Other questions? Thank you very much for your argument. All right, so let's hear again from Mr. Kline. A few quick points.  The distinction between acts in the dual criminality provision and offense in the double jeopardy provision was critical to the decision. I'm looking at page 215 of the opinion. So as we begin our analysis with the language of the treaty, Article VI talks about offense. Article II, the dual criminality provision, talks about acts. The use of the word offense in this context and acts in another signifies that the offenses to be compared during the known BIS inquiry must be something other than the acts underlying those offenses. Again, we have the reverse of that here. We have offense in both places, and the natural inference from this language in Ghan is offense means the same in both places. What is your position about the State Department's explanation of the treaty to the Senate? The technical analysis you're talking about? Yes, technical, that's right. Only what I've said before, which is? Wasn't enough, didn't say enough. It just doesn't provide any analysis. And if you apply the tools of treaty interpretation that I've suggested, those overcome whatever force the technical analysis might have. Let me talk for a minute about Sindona because we've alluded to that but haven't really discussed it. In Sindona, the court concluded that the elements test would not work very well in the extradition context. And I think largely for the reasons that I've articulated. I think the opinion uses the phrase the quiddity of the requested country or something like that. But the bottom line is it's just a matter of coincidence rather than any sort of forethought or system whether the elements overlap in the two settings. So then the court looked to try to find what standard might we apply here. And that was the context in which it looked at Justice Brennan's concurrence in Ash v. Swenson. It wasn't relying on that as the law. It was looking for a standard that could be applied if the elements test wouldn't work. In exactly the same way, the court looked to the petite policy of the Department of Justice, which, by the way, remains in place to this day. The court was having rejected the elements test as essentially unworkable. It was looking for a standard that could be applied. And in looking for a standard, it looked to Justice Brennan's concurrence. It looked to the petite policy. It did not take either one as the law, as binding in some way. They were simply guides in trying to find the standard. Very well. My time is up. Thank you. Thank you, counsel. Thanks to both counsel for your very learned arguments, very helpful. As you can imagine, this is not an everyday case that we get here. So we particularly appreciate the scholarly nature of your briefs and your arguments. So thank you both. The case just argued is submitted.
judges: SMITH, BADE, Fitzwater